UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LETITIA A. JAMES,<br><br>Defendant. | Crim. No. 2:25-cr-122-JKW-DEM |

**BRIEF OF AMICI CURIAE UNITED STATES SENATE DEMOCRATIC LEADER CHARLES SCHUMER AND UNITED STATES HOUSE OF REPRESENTATIVES DEMOCRATIC LEADER HAKEEM JEFFRIES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii
INTRODUCTION ......................................................................................................................... 1
INTERESTS OF AMICI ............................................................................................................... 3
ARGUMENT ................................................................................................................................. 4
    I.    Politically motivated prosecutions are inconsistent with the Constitution and our founding principles. ............................................................................... 4
    II.   President Trump's actions to influence the prosecution of AG James are improper. ........................................................................................................ 7
   III.  The vindictive prosecution of political opponents threatens political speech and the rule of law ............................................................................... 10
CONCLUSION ............................................................................................................................ 13

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Bond v. Floyd,*
385 U.S. 116 (1966)..................................................................................................10

*Bowsher v. Synar,*
478 U.S. 714 (1986)....................................................................................................5

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,*
492 U.S. 257 (1989)....................................................................................................5

*Carpenter v. United States,*
585 U.S. 296 (2018)....................................................................................................2

*Connick v. Myers,*
461 U.S. 138 (1983)..................................................................................................10

*Counterman v. Colorado,*
600 U.S. 66 (2023)....................................................................................................12

*Dombrowski v. Pfister,*
380 U.S. 479 (1965)..............................................................................................2, 11

*Erlinger v. United States,*
602 U.S. 821 (2024)................................................................................................2, 5

*Gundy v. United States,*
588 U.S. 128 (2019)....................................................................................................6

*Hartman v. Moore,*
547 U.S. 250 (2006)..................................................................................................12

*Hurtado v. People of State of Cal.,*
110 U.S. 516 (1884)....................................................................................................4

*Kilbourn v. Thompson,*
103 U.S. 168 (1880)..................................................................................................12

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803)...............................................................................4, 13

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971) ................................................................................................................10

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ..........................................................................................................11, 12

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............................................................................................................2, 10

*Offutt v. United States*,
348 U.S. 11 (1954) ..................................................................................................................13

*People v. Donald J. Trump*,
Index No. 452564/2022 (Sup. Ct. N.Y. Cnty.). .........................................................................1

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ..................................................................................................................6

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ..................................................................................................................4

*Stanford v. State of Tex.*,
379 U.S. 476 (1965) ..................................................................................................................5

*United States v. Ball*,
18 F.4th 445 (4th Cir. 2021) .....................................................................................................9

*United States v. Comey*,
No. 25-cr-272 (E.D.V.A.) ...................................................................................................6, 11

*Wood v. Georgia*,
370 U.S. 375 (1962) ................................................................................................................11

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ..................................................................................................................5

**United States Constitution**

Art. I, § 6, cl. 1 (Speech or Debate Clause) ................................................................................12

Art. I, § 9, cl. 3 (Ex Post Facto Clause) .........................................................................................4

Art. II, § 2, cl. 2 (Appointments Clause) .......................................................................................6

**Statutes**

28 U.S.C. § 546 .................................................................................................................6

**Founding Documents**

Declaration of Independence ............................................................................................4

The Federalist No. 44 (James Madison) ...........................................................................4

The Federalist No. 47 (James Madison) ...........................................................................6

The Federalist No. 84 (Alexander Hamilton) ...................................................................5

The Federalist No. 83 (Alexander Hamilton) ................................................................2, 5

**Other Authorities**

Rachel E. Barkow, Separation of Powers and the Criminal Law, 58 Stan. L. Rev. 989 (2006) .............................................................................................................................5, 6

Department of Justice, Justice Manual § 9-27.001 ..........................................................7

Department of Justice, Justice Manual § 9-27.260(1) .....................................................7

Department of Justice, Justice Manual § 9-27.260(2) .....................................................7

Department of Justice, Justice Manual § 9-27.260(3) .....................................................7

Alan Feuer, et al., *Trump Demands That Bondi Move 'Now' to Prosecute Foes*, N.Y. Times (Sept. 20, 2025) .......................................................................................................8

Alan Feuer and Lily Boyce, *How Trump Is Using the Justice Department to Target His Enemies*, N.Y. Times (Oct. 17, 2025) ..............................................................................11

Alan Feuer, *Trump's Pick to Replace Ousted U.S. Attorney Lacks Prosecutorial Experience*, N.Y. Times (Sept. 22, 2025) ..........................................................................8

Ryan Lucas, *New attorney general moves to align Justice Department with Trumps priorities*, NPR (Feb. 5, 2025) ...........................................................................................7

Office of the Attorney General, *Memorandum Re: Communications with the White House* (Dec. 19, 2007) ..........9

Office of the Attorney General, *Memorandum Re: Communications with the White House and Congress* (May 11, 2009) ..........9

Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm., on the Judiciary, 93rd Cong. 202, at 16 (1974) ..........6

2 Joseph Story, Commentaries on the Constitution § 863 (1st ed. 1833) ..........12

Glenn Thrush et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025) ..........8

# INTRODUCTION[1]

President Donald Trump's public effort to punish and silence those he perceives as critics and adversaries is without modern precedent in this country. The President has made no secret of his intention to use the criminal law to that improper end, and the recent charges filed against New York Attorney General Letitia James are the unconstitutional product of the President's unlawful conduct. *See* No. 2:25-cr-122-JKW-DEM (E.D. Va.) (Dkt. No. 53 (Motion to Dismiss Indictment for Vindictive and Selective Prosecution ("Mot."))).

AG James has twice been elected by the voters of New York State to serve as the Attorney General. She has ably served her constituents in that role, notwithstanding the President's threats to use the power of his office to prosecute and unseat her, and thereby to undermine the will of New York. Indeed, the President's animosity towards AG James is based entirely on her official conduct in furtherance of her statutory obligations as Attorney General: she successfully sued the President for fraud while he was a private citizen. *See People v. Trump*, No. 452564/2022 (N.Y. Sup. Ct. N.Y. Cnty.).

The President's use of the criminal justice system to punish AG James for conduct within the scope of her elected office and on behalf of her constituents is a flagrant violation of AG James's constitutional rights. Our nation's Founders rebelled against the Crown in no small part to end its arbitrary use of criminal sanctions to silence dissent and punish political enemies. Indeed, the President's efforts to secure a criminal indictment against AG James based on his claims that she is "very guilty of something" (Dkt. No. 53 at 15) recalls that earlier era, during which "British officers . . . rummage[d] through homes in an unrestrained search for evidence of

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

1

criminal activity." *Carpenter v. United States*, 585 U.S. 296, 303 (2018).[2] The Framers included in the Bill of Rights the Fifth Amendment's guarantee of due process precisely to protect against "prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions.'" *Erlinger v. United States*, 602 U.S. 821, 832 (2024) (citing The Federalist No. 83 (Alexander Hamilton)). These protections are not mere "procedural formalities," *id.*; they are central to the principles of equal and impartial justice that underlie our constitutional republic.

The President's unlawful targeting of AG James, in addition to violating her individual rights, will have ramifications that extend beyond this case. The President's behavior, like that of the Crown during the colonial era, is intended to suppress dissent, to punish those who challenge his authority, and thereby to chill participation in the political process by other officials and voters alike. By this and similar prosecutions, the President is alerting all those who participate in public life that they do so at the risk of personal and legal peril. If countenanced, the impact of this retributive system will have a "chilling effect upon the exercise of First Amendment rights," *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965), and will undermine our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The Court should reject the President's blatant abuse of the criminal law for political ends and dismiss the charges against AG James.

---

[2] All internal quotation marks, alterations, and citations are omitted from case quotations.

## INTERESTS OF AMICI

Amici curiae are elected officials from the State of New York United States Senate Democratic Leader Charles Schumer and United States House of Representatives Democratic Leader Hakeem Jeffries. Amici have dedicated their careers to public service and to open and robust debate in the marketplace of political ideas. At all times they have benefited in that endeavor from constitutional principles and democratic norms that have for generations protected political speech from improper retribution. For the reasons described herein, amici believe that the circumstances surrounding the instant prosecution of AG James pose a threat to those democratic safeguards, and to the public's faith in the integrity of our criminal justice system and electoral process.

The issues presented in this case transcend any single defendant or administration. The indictment of AG James in retribution for actions undertaken in her official capacity as the State's chief law enforcement officer raises grave constitutional concerns about the use of prosecutorial authority to punish political opposition. Amici have personal and institutional interests in preventing the executive branch from abusing prosecutorial authority in this manner. When the criminal process is deployed as a tool of political retribution, it chills the robust debate the First Amendment guarantees, deters public service, and undermines the public's confidence that law will be administered even-handedly, rather than wielded for partisan ends. Because the prosecution of AG James implicates these core constitutional principles, amici respectfully submit this brief to provide the constitutional context—grounded in history, law, and longstanding practice—that bears on the proper exercise of prosecutorial authority in our democratic system.

## ARGUMENT

### I. Politically motivated prosecutions are inconsistent with the Constitution and our founding principles.

The principle that ours is "a government of laws, and not of men" is central to our republican form of government. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). Only by adherence to this principle can the nation "secure [the] impartial and exact execution of the laws" necessary for a virtuous government. John Adams, Thoughts on Government (1776).[3] The Framers, having been subjected to the Crown's cruel and arbitrary efforts to suppress dissent, suffused the Constitution and Bill of Rights with this idea, and it later gave rise to the Fourteenth Amendment.

Indeed, protection against selective and arbitrary punishment is at the heart of our founding documents. For example, the Declaration of Independence took specific issue with the Crown's abuses of the criminal law, and its despised practice of "transporting us beyond Seas to be tried for pretended offences." Declaration of Independence para. 21 (1776); *see also Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring) (noting that the "founders cited the crown's abuse of 'pretended' crimes" as a reason for rebellion). In the Constitution, article I, section 9, clause 3 prohibits bills of attainder and ex post facto laws—"arbitrary acts . . . which occur[red] so frequently in English history." *Hurtado v. People of State of Cal.*, 110 U.S. 516, 531 (1884). James Madison viewed these arbitrary acts as "contrary to the first principles of the social compact, and to every principle of sound legislation." The Federalist No. 44 (James Madison). And Alexander Hamilton recognized that "[t]he creation of crimes after the commission of the fact . . . and the practice of arbitrary imprisonments, have been, in all ages, the

---

[3] Available at https://founders.archives.gov/documents/Adams/06-04-02-0026-0004.

favorite and most formidable instruments of tyranny." The Federalist No. 84 (Alexander Hamilton).

The Bill of Rights reflects the Framers' intent to impose limitations on the use of criminal prosecutions for improper ends. *See* Rachel E. Barkow, Separation of Powers and the Criminal Law, 58 Stan. L. Rev. 989, 1016 (2006) (noting that "[f]our of the first ten amendments deal explicitly with criminal process"). The Fourth Amendment reflects the Framers' opposition to the Crown's use of the "hated writs of assistance"—i.e., general warrants—that "had so bedeviled the colonists" by "plac[ing] the liberty of every man in the hands of every petty officer." *Stanford v. State of Tex.*, 379 U.S. 476, 481 (1965). The Fifth and Sixth Amendments "seek to mitigate the risk of prosecutorial overreach and misconduct, including the pursuit of 'pretended offenses' and 'arbitrary convictions,'" *Erlinger*, 602 U.S. at 832 (quoting The Federalist No. 83 (Alexander Hamilton)), and the Eighth Amendment protects against "excessive and partisan" punishment, *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266–68 (1989) (noting that the Eighth Amendment "took account" of the abuses that gave rise to the English Bill of Rights in 1689).

In addition to establishing individual rights, the Framers also believed that a constitutional system of "checks and balances" across the three branches of government was necessary to establish "the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[T]he Constitution diffuses power the better to secure liberty"). In particular, our system of checks and balances plays a critical role in the administration of criminal justice. As James Madison explained, "there can be no liberty where the legislative and executive powers are united in the same person[ ] or body" or where "the

5

power of judging [is] not separated from the legislative and executive powers." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 265 (2020) (Kagan, J., concurring) (quoting The Federalist No. 47 (James Madison) (quoting Baron de Montesquieu); *see also Gundy v. United States*, 588 U.S. 128, 156 (2019) (Gorsuch, J., dissenting) (quoting same passage from Federalist No. 47). Under our system, the executive does not have the authority to force a prosecution through the courts to serve his or her own political ends. "All three branches must agree to allow a criminal conviction, and the judiciary plays a particularly significant role because of its relative insulation" from political pressures. *See* Barkow, 58 Stan. L. Rev. at 1031.[4]

It is against this backdrop that our nation has, through its political processes over the past several decades, further separated the person of the President from the executive power to prosecute. For decades, DOJ leadership has sought to ensure that prosecutions are based on "law and merit, and not on considerations of party affiliation, political image making, or White House approval or influence." Brief of Former Senior Officials of the Department of Justice as Amici Curiae at 7, *United States v. Comey*, No. 25-cr-272 (E.D. Va. Oct. 31, 2025) (quoting Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm., on the Judiciary, 93rd Cong. 202, at 16 (1974) (statement of Hon. Theodore Sorenson)). The DOJ Justice Manual reflects these developments, and its publicly available guidelines "ensur[e] the fair and effective exercise of prosecutorial discretion and responsibility by attorneys for the government" and "promot[e] confidence on the part of the public and individual

---

[4] The Administration's appointment of Lindsey Halligan as U.S. Attorney for the Eastern District of Virginia after the earlier-appointed U.S. Attorney for that district reportedly refused to seek an indictment against AG James, violated the Constitution's Appointments Clause, U.S. Const. Art. II, § 2, cl. 2, and 28 U.S.C. § 546 by stacking interim appointments without seeking the advice and consent of the Senate. (*See generally* Dkt. No. 22.) This structural violation enabled the Administration to evade Congress and install a hand-picked prosecutor directed to bring a criminal case against AG James motivated by the President's animus against her.

defendants that important prosecutorial decisions will be made rationally and objectively based on an individualized assessment of the facts and circumstances of each case." Justice Manual § 9-27.001. The Justice Manual expressly directs that prosecutions may not be influenced by politics, personal animus, or personal interests. *See id.* §§ 9-27.260(1)–(3).

## II. President Trump's actions to influence the prosecution of AG James are improper.

In light of this history and practice, President Trump's efforts to procure AG James's prosecution after years of public calls for a revenge campaign against her are clearly improper.

As detailed in AG James's motion to dismiss, President Trump has brazenly and repeatedly called for the prosecution of AG James since her office commenced a civil investigation into the Trump Organization in 2019. (*See generally* Dkt. No. 53 at 3–21; *see also* Dkt. No. 53–1.) In the lead up to the trial that stemmed from the investigation, Mr. Trump called for AG James to be prosecuted fourteen times (Dkt. No. 53 at 5–6 (collecting cites)); referred to AG James as "racist" and as a "disgusting human being" (*id.* (collecting cites)); and called for her impeachment, for her resignation, and for her to be "placed under citizens arrest" (*id.* at 6 (collecting cites)). He continued this rhetoric throughout the trial, while awaiting a judgment, and after the judgment against him was announced. (*Id.* at 7–8 (collecting cites).) His attacks on AG James continued after the November 2024 election. (*Id.* at 8.)

In the months after President Trump's Inauguration, senior officials within his Administration also worked to execute on President Trump's insistence that AG James be prosecuted. U.S. Attorney General Pam Bondi created a "Weaponization Working Group" that was tasked in part with investigating the "federal cooperation with the weaponization" of

7

government allegedly carried out by AG James.[5] Edward Martin—the self-described "captain" of DOJ's Weaponization Working Group—and William Pulte—the head of the Federal Housing Finance Agency—also began investigating AG James, notwithstanding their limited experience handling criminal investigations.[6]

Then, the President directed that AG James be prosecuted. When experienced prosecutors in the Eastern District of Virginia informed DOJ officials that they believed there was insufficient evidence to prosecute AG James, the Administration fired the U.S. Attorney in the district and attempted to unlawfully install a replacement—Lindsey Halligan, a former personal attorney to President Trump with no prosecutorial experience—to seek an indictment against AG James and other perceived political foes.[7] In a September 20, 2025 social media post in which he expressed frustration to Attorney General Bondi that the investigation into AG James and other perceived political adversaries were not moving fast enough, President Trump stated that "JUSTICE MUST BE SERVED, NOW!!!" (*Id.* at 16 (citing Dkt. No. 53-1 at No. 346).) To be clear, the President's misconduct consists not of mere caustic but protected political criticism of AG James; instead, it is the conduct by which he instructed, provoked and compelled her prosecution that crosses a clear constitutional line.

---

[5] Ryan Lucas, *New attorney general moves to align Justice Department with Trumps priorities*, NPR (Feb. 5, 2025), https://www.npr.org/2025/02/05/g-s1-46698/attorney-general-memos-weaponization-trump.

[6] Alan Feuer, *et al.*, *Trump Demands That Bondi Move 'Now' to Prosecute Foes*, N.Y. Times (Sept. 20, 2025), https://www.nytimes.com/2025/09/20/us/politics/trump-justice-department-us-attorneys.html.

[7] Glenn Thrush *et al.*, *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025), https://www.nytimes.com/2025/09/19/us/politics/erik-siebert-comey-letitia-james.html; Alan Feuer, *Trump's Pick to Replace Ousted U.S. Attorney Lacks Prosecutorial Experience*, N.Y. Times (Sept. 22, 2025), https://www.nytimes.com/2025/09/22/us/politics/lindsey-halligan-trump.html

The unprecedented facts surrounding AG James's indictment—described in greater detail in AG James's motion to dismiss (*see* Dkt. No. 53 at 3–21)—reflect the dangers that arise when a president is left unchecked to pursue politically motivated prosecutions. It was exactly this sort of politically motivated prosecution that the Framers sought to avoid by protecting the rights of criminal defendants in the Constitution, and which led generations of DOJ officials to zealously safeguard the department's prosecutorial independence. (*See supra* Part I.) *See also* Office of the Attorney General, *Memorandum Re: Communications with the White House* (Dec. 19, 2007) (explaining that "Communications [between DOJ and the White House] with respect to pending criminal or civil-enforcement matters, however, must be limited" to "ensur[e] that there is public confidence that the laws of the United States are administered and enforced in an impartial manner");[8] Office of the Attorney General, *Memorandum Re: Communications with the White House and Congress* (May 11, 2009) (establishing limits on communications between DOJ and the White House concerning pending or contemplated cases because "[t]he legal judgments of the Department of Justice must be impartial and insulated from political influence").[9] Where, as here, the executive branch has failed to abide by these safeguards, courts must ensure that defendants like AG James are afforded the due process and equal protection rights that are foundational to our criminal and democratic system. *See United States v. Ball*, 18 F.4th 445, 454 (4th Cir. 2021) (vindictive prosecutions have "no place in our system of justice").

---

[8] Available at https://www.justice.gov/sites/default/files/ag/legacy/2008/04/15/ag-121907.pdf.

[9] Available at https://www.justice.gov/oip/foia-library/communications_with_the_white_house_and_congress_2009.pdf/dl.

### III. The vindictive prosecution of political opponents threatens political speech and the rule of law.

The selective prosecution of political adversaries inflicts not only a personal injustice on AG James—it is an assault on free speech generally and the marketplace of political ideas. Our democracy depends on the premise that those who hold or seek public office may criticize, challenge, and oppose those in power—including the president and his administration—without fear of personal reprisal. When the prosecutorial power of the executive branch is deployed against a political rival in an effort to silence or punish her, the harm radiates beyond the single individual: it corrodes the foundations of political freedom, chills political participation, and weakens public confidence in the law as an instrument of justice.

At the heart of our constitutional order lies a commitment to free political contestation and to a government that tolerates, and indeed relies upon, vigorous disagreement and criticism. The First Amendment protects not only the right to speak but the right to use that speech to challenge authority and those in positions of power. As a nation, we are "commit[ted] to the principle that debate on public issues should be uninhibited, robust, and wide-open. . . ." *Sullivan*, 376 U.S. at 270. Political expression of this nature occupies "the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). This "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office," *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), as well as to elected representatives who must necessarily be "given the widest latitude to express their views on issues of policy," *Bond v. Floyd*, 385 U.S. 116, 136 (1966).

"The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v.*

10

*Georgia*, 370 U.S. 375, 395 (1962). To abuse prosecutorial discretion in an effort to punish public officials who dare disagree with the administration chills political discourse among elected representatives and thereby threatens the very mechanism by which democratic accountability is maintained. And that chill on speech is only heightened when the threat of legal retribution comes directly from the President. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191–92 (2024) ("Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official.").

From the perspective of amici—who have dedicated their professional lives to free and robust political debate—the retributive use of the criminal justice system against AG James (and others[10]) stands as a threat to public officials throughout the country, at every level of government, that criticism of President Trump and his political agenda risks personal legal peril. The consequences of a retributive system of criminal justice on our nation's discourse and political order cannot be overstated. Where, as here, the *actual* motivation for prosecution is speech (and more specifically speech critical of the President), the mere existence of the prosecution will have a "chilling effect upon the exercise of First Amendment rights . . . [f]or the threat of sanctions may deter almost as potently as the actual application of sanctions." *Dombrowski*, 380 U.S. at 486–87. The impact of the President's conduct here will reverberate

---

[10] The President's public statements make clear that the charges filed against former FBI Director James Comey are similarly retributive, *see United States v. Comey*, Crim. No. 1:25-cr-272 (E.D.V.A), as are apparently ongoing investigations into other current former officials who have criticized the President, *see* Alan Feuer and Lily Boyce, *How Trump Is Using the Justice Department to Target His Enemies*, N.Y. Times (Oct. 17, 2025), https://www.nytimes.com/interactive/2025/10/07/us/politics/trump-enemies-justice-department-investigations.html (listing investigations believed to be "underway" and "other targets" of similar investigations).

through the townhalls, legislative chambers, courtrooms, and government office buildings of public officials and civil servants on the local, state, and federal level.

If speaking out against corruption, investigating wrongdoing, criticizing government policy, or enforcing the law against powerful interests can potentially lead to prosecution and personal ruin, many might simply refrain and retreat from public service. Such self-censorship—born not of law but of fear—degrades the quality of democratic decision-making as public officials are forced to operate under threat that the lawful exercise of their authority might provoke personal retaliation. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (discussing "self-censorship" and "chilling effect" stemming from "concern[] about the expense of becoming entangled in the legal system"). The result would be a slow attrition of independence, as decisions are shaded toward caution, oversight becomes timorous, and public servants are driven away from civic life. That outcome is one the Framers sought to prevent. *See* U.S. Const. art. I, § 6, cl. 1 (Speech or Debate Clause); *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880) ("'The next great and vital privilege is the freedom of speech and debate, without which all other privileges would be comparatively unimportant or ineffectual.'" (quoting 2 Joseph Story, Commentaries on the Constitution § 863 (1st ed. 1833))); *Vullo*, 602 U.S. at 189 ("[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." (citation modified)); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.").

In short, the consequences of a vindictive political prosecution reach far beyond the parties to any particular case and strike at our fundamental existence as a nation of laws. When

12

the public perceives that prosecutorial power can be deployed as a tool of political retribution, confidence in the impartial administration of the law is eroded. As the Supreme Court famously stated: "[J]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). Even the perception that law enforcement can be marshaled against political adversaries invites cynicism into our public life and corrodes confidence in our democratic institutions and the Constitution amici have sworn to uphold. In that environment, the rule of law loses its moral authority. The prosecutorial power, once understood as a trust exercised in the public interest, is reduced to an instrument of political factions.

For these reasons, the Court should view this prosecution as not merely an aberrant exercise of discretion, but as a direct challenge to the structural safeguards that make our nation "a government of laws, and not of men." *Marbury*, 5 U.S. at 163.

## CONCLUSION

Amici respectfully submit that the Court should grant AG James's request for relief.

November 14, 2025

Respectfully submitted,
/s/ _____

Lawrence H. Woodward, Jr., Esq.
RULOFF, HADDAD, & WOODWARD, P.C.
317 30th Street
Virginia Beach, Virginia 23451
Telephone: (757) 671-6047
Fax: (757) 671-6004

Carey R. Dunne, Esq. (*pro hac vice forthcoming*)
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018
Telephone: (646) 434-8604
carey@freeandfair.org

*Counsel for Amici Curiae*

13