**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

UNITED STATES OF AMERICA,

    v.

LETITIA A. JAMES,

       Defendant.

Case No.: 2:25-CR-00122-JKW-DEM

---

**BRIEF OF FIFTY-EIGHT BIPARTISAN FORMER STATE ATTORNEYS GENERAL AS AMICI CURIAE IN SUPPORT OF LETITIA JAMES' MOTION TO DISMISS**

KEVIN BYRNES (VA Bar No. 47623)
FLUET
1751 Pinnacle Drive, Suite 1000,
Tysons, VA 22102
(703) 590-1234
Kbyrnes@fluet.law

JOSHUA PERRY*
VICTORIA RECALDE FELDMAN*
BRITTANY HANKE*
PERRY LAW, LLC
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

NORMAN L. EISEN*
STEPHEN A. JONAS*
JOSHUA G. KOLB*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Norman@democracydefenders.org
Steve@democracydefenders.org
Joshua@democracydefenders.org

WENDY R. WEISER*
MIRIAM ROSENBAUM*
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
Weiserw@brennan.law.nyu.edu
Rosenbaumm@brennan.law.nyu.edu

*Counsel for Amici*
*\* Pro hac vice motion pending*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... iii

IDENTITY AND INTEREST OF AMICI ................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................................ 6

ARGUMENT ........................................................................................................................... 6

   I.   This Court should bring heightened scrutiny to bear on the government's misconduct...... 6

     A.   This vindictive prosecution will chill states' constitutional prerogatives to enforce their laws and protect their residents. ........................................................................................... 7

     B.   This Court should deploy heightened scrutiny because this vindictive prosecution infringes on core constitutional rights and prerogatives........................................................ 14

   II.   The government's unprecedented machinations undercut the presumption of regularity.  17

CONCLUSION......................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alden v. Maine*, 527 U.S. 706 (1999) .................................................................... 7

*Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) .......................... 11

*Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914 (D.C. Cir. 2021) ....................................... 16

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985) ..................................................... 12

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ............................................. 12

*Barker v. Wingo*, 407 U.S. 514 (1972) ...................................................................... 12

*Berman v. Parker*, 348 U.S. 26 (1954) ...................................................................... 8

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................. 8, 16

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ............................................................... 14

*Danforth v. Minnesota*, 552 U.S. 264 (2008) ................................................................ 8

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ................................................................ 19

*FERC v. Mississippi*, 456 U.S. 742 (1982) ................................................................. 11

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................................... 8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................................. 12, 16

*Grenada Lumber Co. v. Mississippi*, 217 U.S. 433 (1910) ..................................................... 8

*Hartman v. Moore*, 547 U.S. 250 (2006) .................................................................... 14

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ............................................................ 13

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1 (1st Cir. 2012) ...................... 16

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................................................. 15

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ............................................ 12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ........................................ 7, 10, 12

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) ........................................ 16

*People by James v. Trump*, 217 A.D.3d 609 (1st Dep't 2023) ............................................. 11, 16

*Printz v. United States*, 521 U.S. 898 (1997) ............................................................. 12

*Schad v. Arizona*, 501 U.S. 624 (1991) .................................................................... 19

*Sewell v. State*, No. 23-K-16-000289, 2021 WL 3855845, (Md. Ct. Spec. App. Aug. 30, 2021). 17

*SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) ...................................................... 8

*State of Missouri v. State of Illinois*, 180 U.S. 208 (1901) ................................................ 1

*State v. Adams*, 293 Md. 665 (1982) .................................................................................... 18

*State v. Figueroa*, No. A-2431-07T4, 2010 WL 3516836 (N.J. Super. Ct. App. Div. Aug. 31, 2010) ......................................................................................................................................... 18

*State v. Gales*, 269 Neb. 443 (2005) .................................................................................... 17

*State v. Tsosie*, 171 Ariz. 683 (Ct. App. 1992) .................................................................... 18

*United States v. Armstrong*, 517 U.S. 456 (1996) ............................................................... 17

*United States v. Ball*, 18 F.4th 445 (4th Cir. 2021) ............................................................ 14

*United States v. Comey*, No. 25-CR-272 (E.D. Va.) ............................................................ 19

*United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972) ............................................... 15

*United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) ........................................................... 15

*United States v. Goodwin*, 457 U.S. 368 (1982) .................................................................. 14

*United States v. Jenkins*, 504 F.3d 694 (9th Cir. 2007) ...................................................... 15

*United States v. Lopez*, 514 U.S. 549 (1995) ....................................................................... 16

*United States v. Marion*, 404 U.S. 307 (1971) .................................................................... 12

*United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972) ....................................................... 15

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926) .......................................... 17

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ..................................................... 16

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................................................ 8, 15, 16

*Younger v. Harris*, 401 U.S. 37 (1971) ............................................................................... 10

## STATUTES

12 U.S.C. § 5538(b)(1) .......................................................................................................... 10

18 U.S.C. §§ 248 ................................................................................................................... 10

42 U.S.C. § 1320d-5 .............................................................................................................. 10

Ia. Code Ann. § 714.16 ........................................................................................................... 8

Md. Code Ann., Com. Law § 13-406 ...................................................................................... 8

N.J. Stat. Ann. § 56:8-3 ........................................................................................................... 8

## OTHER AUTHORITY

Abigal Stempson, Consumer Protection, in State Attorneys General Powers and Responsibilities 247 (Emily Myers ed., 2018) ................................................................ 1, 8, 9

Attorneys General, Nat'l Ass'n of Atty's Gen., https://perma.cc/2DE3-BE9Z .......................... 10

Def.'s Mot. Dismiss, Dkt. No. 53 ................................................................................ 2, 6, 13, 18

Emily Myers, Conduct of Litigation, in STATE ATTORNEYS GENERAL POWERS AND RESPONSIBILITIES 91 (Emily Myers ed., 2018) .......................................................... 1

Ernest A. Young, State Standing and Cooperative Federalism, 94 Notre Dame L. Rev. 1893 (2019) ...............................................................................................................11

Glenn Thrush et al., Trump Loyalists Push 'Grand Conspiracy' as New Subpoenas Land, N.Y. TIMES (Nov. 9, 2025)........................................................................................... 19

Jacob Hamburger, State Standing After United States v. Texas, 66 B.C. L. Rev. 1 (2025) .......... 10

Jessica Bulman-Pozen & Heather K. Gerken, Uncooperative Federalism, 118 Yale L.J. 1256 (2009) ............................................................................................................... 1

Josh Gerstein, How John Bolton's criminal case stacks up to other high-profile classified docs probes, POLITICO (Oct. 22, 2025, 5:55 AM) ................................................. 19

Katelyn Polantz & Donald Judd, Prosecutors are hesitant to charge Trump foe Adam Schiff, sources say, CNN (Oct. 23, 2025, 6:27 PM)............................................................ 19

Press Release, Office of the Cal. Att'y Gen., Attorney General Becerra Announces Over $550 Million Settlement Against Nation's Largest Subprime Auto Financing Company for Deceptive Auto Loan Practices (May 19, 2020) ......................................................... 9

Press Release, Office of the N.Y. Att'y Gen., Attorney General James Announces Court Win Allowing Lawsuit Against Citibank to Continue (Jan. 21, 2025) ............................... 9

Press Release, Office of the N.Y. Att'y Gen., Attorney General James Sues Capital One for Bait-and-Switch Tactics That Cost Customers Millions" (May 14, 2025) ........................ 9

Press Release, Office of the N.Y. Att'y Gen., Attorney General James Sues to End Google's Illegal Monopolies (Dec. 17, 2020) ....................................................................... 10

Press Release, Office of the Tex. Att'y Gen., Attorney General Ken Paxton and Multistate Coalition Reach $7.4 Billion Settlement With Purdue Pharma for Its Role in the Opioid Crisis (June 23, 2025) ........................................................................................... 9

Rebecca E. Wolitz, States, Preemption, and Patented Drug Prices, 52 Seton Hall L. Rev. 385 (2021) ............................................................................................................... 8

William Baude & Samuel L. Bray, Proper Parties, Proper Relief, 137 Harv. L. Rev. 153 (2023) 11

## IDENTITY AND INTEREST OF AMICI[1]

This case asks whether the federal government can break with deeply-entrenched prosecutorial norms to retaliate against a state attorney general who fulfilled her constitutional responsibility to enforce her state's laws. Amici are fifty-eight former state attorneys general, from both major parties, committed to a responsible federalism that empowers states to pursue their own policy preferences within constitutional constraints. They know that the answer here has to be *no*.

In our federalist system, states have both the constitutional prerogative and the democratic responsibility to fight for the health, safety, prosperity, and rights of their residents.[2] As states' chief legal officers, state attorneys general are charged with vindicating that prerogative and fulfilling that responsibility.[3] Through their attorneys general, states litigate—among many other things—to preserve their environments; prosecute crime; protect the public fisc; and break up harmful monopolies. And, most relevantly here, state attorneys general across the country litigate to protect consumers and promote fair competition by policing corporate fraud.[4]

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money to fund the preparation or submission of this brief. Amici filed this brief together with a motion for leave to file.

[2] *See, e.g.*, *State of Missouri v. State of Illinois*, 180 U.S. 208, 241 (1901) ("But it must surely be conceded that, if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them."); Jessica Bulman-Pozen & Heather K. Gerken, *Uncooperative Federalism*, 118 Yale L.J. 1256, 1261 (2009) ("State autonomy helps create laboratories of democracy, diffuse power, foster choice, safeguard individual rights, and promote vibrant participatory opportunities for citizens.").

[3] *See* Emily Myers, *Conduct of Litigation*, *in* STATE ATTORNEYS GENERAL POWERS AND RESPONSIBILITIES 91, 91 (Emily Myers ed., 2018) ("The conduct of litigation on behalf of the state is one of the attorney general's primary duties. The attorney general is typically charged, by Constitution or statute, with representing the state in all cases in which the state has an interest, in all courts of the state and in federal courts.").

[4] *See* Abigail Stempson, *Consumer Protection*, *in* STATE ATTORNEYS GENERAL POWERS AND RESPONSIBILITIES 247, 286-88 (Emily Myers ed., 2018) (listing consumer protection statutes in each state).

That is what Attorney General Letitia James did when her office investigated and sued then-former President Donald Trump and the Trump Organization, alleging that they had "falsely inflated" Trump's "net worth to induce favorable loan terms, secure insurance coverage, and obtain tax benefits." Def.'s Mot. Dismiss ("MTD") at 5, Dkt. No. 53. AG James proved her case. *Id*. at 7. And, as AG James' opening brief documents, now-President Trump retaliated with a six-year campaign of invective and retributionist threats. *See id*. at 3-8. Ultimately, he commanded the U.S. Attorney General to prosecute AG James, whom he characterized as "very guilty of something." *Id*. at 15-19. He fired the acting U.S. Attorney for the Eastern District of Virginia, who refused to seek a meritless indictment. *Id*. And he installed his own personal lawyer, who had never prosecuted a case before, to pursue payback. *Id*.

As their states' former lead prosecutors, Amici embrace existing doctrine that sets a high bar for vindictive and selective prosecution claims. In the normal course—where the government has earned a presumption of regularity through careful adherence to professional norms of ethical prosecution—those claims *should* be hard to win. Every prosecutorial decision is an act of discretion, and the vast majority of prosecutions are brought ethically and for proper reasons.

But Amici also know that existing doctrine cannot be a carte blanche for abusive prosecutions driven by personal and political animus. Existing doctrine strikes the right balance, and courts must preserve that balance—ensuring ethical prosecution and the rule of impartial law, and protecting both individual rights and the legal system's integrity. Amici have a profound interest in furthering those objectives, to which they have dedicated their professional lives.

If there ever were an occasion to enforce vindictive prosecution doctrine and dismiss, this is it. Based on publicly-available facts and AG James' allegations, the vexatious prosecution of AG James appears to be motivated by personal and political vendettas. The government's

vindictive prosecution threatens the substance and appearance of justice for every litigant in every case everywhere. Because this is such an unusual and extreme case, dismissing this prosecution would not open the floodgates to meritless claims or interfere with normal prosecutorial conduct. To the contrary, it would reinforce core values of fairness and impartiality essential to ethical prosecution. And it would ensure that state attorneys general can fulfill their vital constitutional function free of the threat of federal reprisal.

Amici are:

- Robert Abrams (New York)
- Jeff Amestoy (Vermont)
- Bruce Babbitt (Arizona)
- Paul Bardacke (New Mexico)
- Bill Baxley (Alabama)
- Bruce Botelho (Alaska)
- Richard H. Bryan (Nevada)
- Steve Bullock (Montana)
- Bob Butterworth (Florida)
- Leevin T. Camacho (Guam)
- Bonnie Campbell (Iowa)
- Doug Chin (Hawaii)
- Walter Cohen (Pennsylvania)
- Frederick D. Cooke, Jr. (District of Columbia)
- Fred Cowan (Kentucky)
- Joe Curran (Maryland)

- Marc Dann (Ohio)

- Frankie Sue Del Papa (Nevada)

- Jerry Diamond (Vermont)

- Josh Diamond (Vermont)

- Mike Easley (North Carolina)

- John Easton (Vermont)

- Rufus Edmisten (North Carolina)

- Drew Edmondson (Oklahoma)

- John Farmer (New Jersey)

- Karen Freeman-Wilson (Indiana)

- Steve Freudenthal (Wyoming)

- Brian Frosh (Maryland)

- Chris Gorman (Kentucky)

- Christine O. Gregoire (Washington)

- Scott Harshbarger (Massachusetts)

- Neil Hartigan (Illinois)

- Peter Harvey (New Jersey)

- Heidi Heitkamp (North Dakota)

- Hubert H. Humphrey, III (Minnesota)

- Jim Jones (Idaho)

- Jahna Lindemuth (Alaska)

- Bill Lockyer (California)

- David Louie (Hawaii)

- Patricia Madrid (New Mexico)

- Robert A. Marks (Hawaii)

- Brian McKay (Nevada)

- Frank Mendicino (Wyoming)

- Tom Miller (Iowa)

- Jeff Modisett (Indiana)

- Mike Moore (Mississippi)

- Janet Napolitano (Arizona)

- Nancy Rogers (Ohio)

- Steve Rosenthal (Virginia)

- Mark Shurtleff (Utah)

- Greg Smith (New Hampshire)

- Bill Sorrell (Vermont)

- Mary Sue Terry (Virginia)

- Jim Tierney (Maine)

- Anthony F. Troy (Virginia)

- Tom Udall (New Mexico)

- Lawrence Wasden (Idaho)

- Robert O. Wefald (North Dakota)

## SUMMARY OF ARGUMENT

In a justice system whose prosecutions have earned the presumption of regularity, vindictive prosecution claims will seldom be brought and should seldom succeed. But existing vindictive prosecution doctrine provides a vital check against abuse when the justice system goes awry. The Court need not, and should not, change existing doctrine. It should enforce that doctrine by granting Attorney General Letitia James' requested relief.

Amici, fifty-eight former state attorneys general, write to make two primary arguments. *First,* the Court should bring heightened scrutiny to bear on the vindictive prosecution of AG James. This prosecution will chill sovereign state law enforcement, and courts have long been especially vigilant when government action infringes on core constitutional rights and structural prerogatives—like the prerogative of states to enforce their own laws. *Second*, because the record shows the breakdown of the normal protections against prosecutorial misconduct, this Court should not afford the government the deference that comes with the presumption of regularity.

## ARGUMENT

### I.  This Court should bring heightened scrutiny to bear on the government's misconduct.

Attorney General James rightly contends that the meritless charges against her "target the sovereignty of New York, not just AG James." MTD at 28-29. She understates her case, though: this prosecution targets every state's sovereignty. In retaliating against a state attorney general's lawful exercise of her consumer protection authority, the President and his handpicked prosecutor would criminalize the states' sovereign interest in enforcing their own laws, inevitably chilling the exercise of their core constitutional prerogatives.

There is no precedent for the transparently vindictive federal prosecution of a state attorney general in retaliation for her law enforcement action. Because no prior administration has crossed

that line, no court has ever had the occasion to hold that special scrutiny is appropriate in cases like this one. But federal courts have always been especially vigilant in protecting the rights of defendants who bring vindictive or selective prosecution claims that implicate core constitutional rights and prerogatives. And federal courts have often exercised heightened scrutiny when federal action infringes on state sovereignty.

This case lies at the nexus of those two jurisprudential lines. The doctrinal issues in resolving AG James' vindictive prosecution claim are whether she has demonstrated genuine animus and whether that animus motivated this prosecution. But, in conducting its analysis, this Court should consider the constitutional context and deploy heightened scrutiny. The government's vindictive prosecution cannot survive that scrutiny.

### A. This vindictive prosecution will chill states' constitutional prerogatives to enforce their laws and protect their residents.

States are independent sovereigns whose chief legal officers must be free to protect their residents and enforce their laws without inappropriate federal interference. This prosecution will chill that sovereign prerogative.

*1.* The federal Constitution protects the prerogatives and dignity of the independent sovereign states. *Alden v. Maine*, 527 U.S. 706, 714 (1999) ("The federal system established by our Constitution…. reserves to [states] a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status."). Sovereignty is both an inalienable state interest and a safeguard of individual liberty: "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 536 (2012) (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)); *see also Bond v. United States*, 564

U.S. 211, 222 (2011) ("By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power.").

Perhaps chief among states' sovereign prerogatives is "to make and enforce their own laws[.]" *Danforth v. Minnesota*, 552 U.S. 264, 280 (2008). Each state came into the union with its core police powers intact, subject only—and only sometimes subject—to congressional preemption. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). Those police powers include the powers to protect "[p]ublic safety, public health, morality, peace and quiet, law and order[.]" *Berman v. Parker*, 348 U.S. 26, 32 (1954); *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (States have always possessed "great latitude" to exercise their police powers to protect "the lives, limbs, health, comfort, and quiet of all persons").

Among many other things, states exercise their traditional police powers by protecting consumers from predation, shielding residents from corporate fraud, and promoting a level economic playing field.[5] Every state has consumer protection laws, and the vast majority of states empower their attorneys general to wield the state's sovereign power to enforce those laws and police bad corporate actors.[6] State attorneys general are, as the National Association of Attorneys

---

[5] *See, e.g.*, *Grenada Lumber Co. v. Mississippi*, 217 U.S. 433, 442 (1910) (upholding state antitrust statute as an exercise of the state's police powers); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007) ("[C]onsumer protection is a field traditionally subject to state regulation"); Rebecca E. Wolitz, *States, Preemption, and Patented Drug Prices*, 52 Seton Hall L. Rev. 385, 434 (2021) ("State regulations to protect against price gouging or to otherwise regulate prices in the name of public welfare have long been recognized as legitimate ends of state police powers.").

[6] *See, e.g.*, IA. CODE ANN. § 714.16(7) (empowering the state attorney general to enforce the Iowa Consumer Fraud Act); MD. CODE ANN., COM. LAW § 13-406 (same in Maryland); N.J. STAT. ANN. § 56:8-3 (same in New Jersey); *see generally* Stempson, *supra* note 4, at 286-88 (listing consumer protection statutes in each state).

General (NAAG) proudly proclaims, "a leading consumer protection force in the country."[7] Consumer protection is a major focus of state attorney general efforts and resources: "Most state attorney general offices," NAAG explains, "have a segment of the office solely dedicated to consumer protection to help meet the challenges of the marketplace and the high expectations of their state citizens."[8]

State attorneys general must be, and traditionally have been, free to protect states and their residents against wealthy and powerful business interests. AG James, for instance, has brought consumer protection actions against massive corporations like Citibank and Capital One, against whom individual residents might be powerless.[9] And she is hardly alone. In just the last couple of decades, state attorneys general from across the country, from all states and both major parties, have initiated and won consumer protection lawsuits to reign in abuses by some of the nation's richest and most influential companies, without fear of reprisal.[10]

*2.* State attorneys general have often exercised their consumer protection police powers, and their other enforcement powers, in cooperation with the federal government. Sometimes this means coordinated enforcement efforts: AG James, for instance, co-led a bipartisan, multistate coalition that collaborated with the federal Department of Justice in suing search giant Google for

---

[7] Stempson, *supra* note 4, at 247.

[8] *Id*. at 248.

[9] *See* Press Release, Office of the N.Y. Att'y Gen., Attorney General James Announces Court Win Allowing Lawsuit Against Citibank to Continue (Jan. 21, 2025), https://perma.cc/X5Z6-W3GJ; Press Release, Office of the N.Y. Att'y Gen., Attorney General James Sues Capital One for Bait-and-Switch Tactics That Cost Customers Millions" (May 14, 2025), https://perma.cc/N2F5-B74F.

[10] *See, e.g.*, Press Release, Office of the Tex. Att'y Gen., Attorney General Ken Paxton and Multi-state Coalition Reach $7.4 Billion Settlement With Purdue Pharma for Its Role in the Opioid Crisis (June 23, 2025), https://perma.cc/3C3P-2HJC; Press Release, Office of the Cal. Att'y Gen., Attorney General Becerra Announces Over $550 Million Settlement Against Nation's Largest Subprime Auto Financing Company for Deceptive Auto Loan Practices (May 19, 2020), https://perma.cc/5ZWY-S8DM.

antitrust violations.[11] And sometimes, state attorneys general collaborate in federalism by deploying delegated federal power to enforce the law in myriad areas where Congress has authorized them to act, from consumer protection to human trafficking to public health.[12]

But even—and perhaps especially—when they clash with the federal government's policy preferences, states have the constitutional prerogatives to decide, through their attorneys general, when and how they will enforce their laws. *See Younger v. Harris*, 401 U.S. 37, 44 (1971) (federalism is characterized by the core "belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."). State attorneys general are best situated to know and act on state interests. In forty-three states (including New York), attorneys general are popularly elected by residents.[13] Precisely because state attorneys general are "more local and more accountable than a distant federal bureaucracy," they are entrusted, in the first instance, with protecting "the lives, liberties, and properties" of state residents. *NFIB*, 567 U.S. at 536. States must be free to act independently of, even in opposition to, the federal government: "As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention." *Alfred*

---

[11] *See* Press Release, Office of the N.Y. Att'y Gen., Attorney General James Sues to End Google's Illegal Monopolies (Dec. 17, 2020), https://perma.cc/GZX6-B74D.

[12] *See* 12 U.S.C. § 5538(b)(1) ("[I]n any case in which the attorney general of a State has reason to believe that an interest of the residents of the State has been or is threatened or adversely affected … the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States…"); 18 U.S.C. §§ 248, 1595; 42 U.S.C. § 1320d-5; *see generally* Jacob Hamburger, *State Standing After United States v. Texas*, 66 B.C. L. Rev. 1, 39 (2025) (describing how "[c]ooperative federalism schemes also frequently involve authorizing states to sue to enforce federal laws.").

[13] *See Attorneys General*, Nat'l Ass'n of Atty's Gen., https://perma.cc/2DE3-BE9Z .

*L. Snapp & Sons, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 612 (1982) (Brennan, J., concurring).[14]

And states, through attorneys general from both major parties, have exercised that prerogative to disagree with the federal government both robustly and frequently. "I go into the office," explained former Texas Attorney General Greg Abbott, "I sue the federal government, and I go home."[15] He is hardly the only one. As one pair of scholars recently put it: "Now, when a Republican administration does something consequential and controversial, it will almost certainly be sued by a group of Democratic states, and when a Democratic administration does something consequential and controversial, the roles reverse."[16] That state pushback can be an essential check against federal government overreach. *See FERC v. Mississippi*, 456 U.S. 742, 790 (1982) (O'Connor, J., concurring in the judgment in part and dissenting in part) ("Our federal system provides a salutary check on governmental power."). When they challenge the federal government within the constitutional system, states and their attorneys general serve as a "counterpoise" to federal power, just as the Framers intended. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240

---

[14] This sovereign prerogative to set an agenda and enforce state protections laws, even against the powerful, is exactly why New York's courts rejected the Trump Organization's challenges to AG James' enforcement action. *See People by James v. Trump*, 217 A.D.3d 609, 610 (1st Dep't 2023) (upholding the enforcement action as "vindicating the state's sovereign interest in enforcing its legal code – including its civil legal code – within its jurisdiction."). *See also Trump v. James*, No. 121-cv-1352BKSCFH, 2022 WL 1718951, at *11 (N.D.N.Y. May 27, 2022) (abstaining from hearing challenge because the enforcement action "implicates an important state interest" in "investigating and enforcing [state] laws").

[15] Ernest A. Young, *State Standing and Cooperative Federalism*, 94 Notre Dame L. Rev. 1893, 1893 (2019).

[16] William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 165 (2023) (calculating, in late 2023, that "Republican state attorneys general initiated 58 lawsuits against the Obama Administration; Democratic state attorneys general initiated 155 lawsuits against the Trump Administration; and Republican state attorneys general have already initiated 59 lawsuits against the Biden Administration.").

(1985) ("The Framers believed that the States played a vital role in our system and that strong state governments were essential to serve as a 'counterpoise' to the power of the Federal Government.").

Again and again, across a range of contexts, courts have affirmed that a sovereign state's freedom to make its own policy and direct its own government necessarily means freedom from inappropriate federal coercion. The federal government cannot "determine the qualifications" of important state government officials. *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991). It cannot directly command state government officials to "administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). It cannot, in fact, directly order state governments to do anything. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018) ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."). And it cannot do indirectly what it could not do directly, coercing state compliance with a "gun to the head." *NFIB*, 567 U.S. at 581.

*NFIB* articulated that principle in the context of federal funding, but it holds true in the far more coercive context of criminal prosecutions, too. Arrest and prosecution are the most extreme exercises of the government's power to coerce compliance and restrict liberty. *See, e.g.*, *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) ("[E]ven if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility"); *United States v. Marion*, 404 U.S. 307, 320 (1971) ("arrest," even if it does not come with detention, "is a public act that may seriously interfere with the defendant's liberty"). The credible threat of prosecution alone works a constitutional injury when it coerces compliance with prosecutors' dictates at the expense of the exercise of core constitutional rights. *See, e.g.*, *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional

12

interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (cleaned up); *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (there is an injury in fact for standing purposes "when a claimant is chilled from exercising his right to free expression.").

*3.* This vindictive prosecution of a state attorney general for doing her job will chill her current and future peers across the country, coercing them into shirking their responsibilities to avoid the threat of federal prosecution.

AG James enforced New York law against a New York business and its owner, protecting the people of New York against corporate fraud. The owner, of course, soon became the most powerful person in the country—and President Trump, as AG James lays out, deployed the power of the federal government to take revenge. This vindictive prosecution sets a dangerous precedent. State attorneys general must frequently clash with powerful people and with the federal government. They cannot do their constitutionally-necessary jobs if they fear that enforcing the law and protecting their state interests will bring federal prosecution.[17]

The point here is not just the policy argument that this prosecution will harm our federalism by deterring state attorneys general from pursuing enforcement actions that anger whichever party holds the presidency. That would be bad enough on its own, but the policy argument has an analytical implication. Because the prosecution will necessarily chill state attorney general law enforcement, this Court should carefully scrutinize the government's actions, explanations, and

---

[17] This case is not just about an alleged law violation in AG James' private life. As AG James explains, DOJ's campaign against AG James has metastasized into direct interference with the New York Attorney General's Office's unrelated investigations into the National Rifle Association. MTD at 20-21.

motives—as courts have often done when the federal government infringes on core individual rights and structural prerogatives.

**B. This Court should deploy heightened scrutiny because this vindictive prosecution infringes on core constitutional rights and prerogatives.**

This unprecedented case arises at the confluence of two jurisprudential lines. The first promises the especially vigilant protections of the courts to defendants who plausibly allege that the government's vindictive or selective prosecution trenches on a core constitutional right like the freedom of speech or the right to testify. The second brings heightened scrutiny to bear on federal actions that infringe on the core prerogatives of sovereign states. Both militate in favor of taking an especially hard look at the government's actions here.

The Constitution does not tolerate prosecution aimed at penalizing or discouraging the lawful exercise of constitutional rights. To prosecute someone "because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (citation omitted). And "while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right," such as engaging in protected speech or statutory duties. *United States v. Goodwin*, 457 U.S. 368, 372 (1982); *see Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.") (citation omitted). Such vindictive prosecutions have "no place in our system of justice." *United States v. Ball*, 18 F.4th 445, 454 (4th Cir. 2021). Vindictive prosecution doctrine, then, has both a reactive and a prophylactic function. It serves not just to penalize the government for past misbehavior but also to "prevent chilling the exercise of legal rights by other defendants who must make their choices under similar

14

circumstances in the future." *United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. 2007) (cleaned up).

To prevent the government from chilling the exercise of core rights, courts take an especially hard look at vindictive prosecutions that trench on those rights. For instance: courts presume vindictiveness, shifting the burden to the prosecution, when the government ups the charges in response to an accused person's decision to take the witness stand. *Id.* Courts have similarly engaged in more careful review of selective prosecution claims where prosecutions chill freedom of speech. *See, e.g.*, *United States v. Crowthers*, 456 F.2d 1074, 1078 (4th Cir. 1972) (reversing burden of proof onto government to rebut inference of double standard where the record "strongly suggests invidious discrimination and selective application of a regulation to inhibit the expression of an unpopular viewpoint"); *United States v. Falk*, 479 F.2d 616, 624 (7th Cir. 1973) (remanding for further review of the "seemingly inherent discrimination" against defendant for exercising First Amendment rights as a conscientious objector and anticipating the need for "compelling evidence to the contrary" by the government); *United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) ("An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right.").

That heightened scrutiny around chilling constitutional rights extends to special vigilance where federal action threatens the structural prerogatives of sovereign states. Federalism requires federal courts to "respect . . . the States as 'independent sovereigns in our federal system.'" *Wyeth v. Levine,* 555 U.S. 555, 565 n.3 (2009) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

Over and over, courts have understood this fundamental constitutional principle to mandate resolving ambiguities and close questions in favor of protecting state sovereignty in areas of

traditional state authority, in deference to "the usual constitutional balance of federal and state powers." *Bond*, 572 U.S. at 858 (quoting *Gregory*, 501 U.S. at 460). The federalism canon counsels courts not to find that Congress "alter[ed] the usual constitutional balance between the States and the Federal Government" absent an "unmistakably clear" statutory command. *Gregory*, 501 U.S. at 460 (citations omitted). Similarly, the Supreme Court has recognized an "assumption" against federal preemption in areas traditionally regulated by the States. *See Levine*, 555 U.S. at 565. The Supreme Court has applied heightened scrutiny to federal statutes that intrude on traditional state powers, even where those statutes are typically subject to rational basis review. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009); *United States v. Lopez,* 514 U.S. 549 (1995). Other federal courts have followed suit, finding that federalism concerns mandate "a closer examination" of federal actions that intrude into areas traditionally regulated by the states. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 13 (1st Cir. 2012); *see also Am. Lung Ass'n v. Env't Prot. Agency*, 985 F.3d 914, 969 n.12 (D.C. Cir. 2021), rev'd on other grounds sub nom. *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) (contrasting the need to "patrol the boundaries between federal and state authority with vigilance" with the less stringent review required for disputes between federal agencies).

The confluence of these two doctrinal trends counsels heightened scrutiny here. AG James, acting in her official capacity, was "vindicating the state's sovereign interest" by enforcing its consumer protection laws against corporate wrongdoers. *People by James v. Trump*, 217 A.D.3d 609, 610 (1st Dep't 2023). The prosecution threatens not just AG James' individual rights but also the *ex officio* constitutional and statutory obligations of every state attorney general. So this Court should give it the same hard look that courts always give when prosecutions and other federal actions chill core constitutional rights and state prerogatives, resolving all close questions in favor

of AG James. By that standard—and by any standard—it should grant AG James' motion to dismiss.

## II. The government's unprecedented machinations undercut the presumption of regularity.

The government's misconduct has sapped the foundation of the usual (and appropriately deferential) prosecutorial vindictiveness standard. Judges generally give prosecutors leeway, declining most invitations to second-guess prosecutorial charging decisions, because a history of ethical probity and a strong system of procedural checks give rise to a "presumption of regularity." *United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (*citing United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). Under a responsible sovereign, careful and ethical government practices both define and sustain the presumption of regularity. But here the government, with its extraordinary machinations to secure a tenuous indictment, forfeited any such presumption. Amici, who have deep experience with properly-administered state criminal justice systems, can attest to the profound irregularity of the proceedings that led to this indictment.

State courts across the country, like federal courts, are appropriately cautious about granting relief in the run of vindictive prosecution claims, largely because states have built traditions of fair and impartial justice that justify a presumption of regularity. *See, e.g.*, *Sewell v. State*, No. 23-K-16-000289, 2021 WL 3855845, at *11 (Md. Ct. Spec. App. Aug. 30, 2021) ("Prosecutors are entitled to a presumption of regularity in how they exercise their discretion."); *State v. Gales*, 269 Neb. 443, 462 (2005) ("The presumption of regularity supports prosecutorial decisions, and in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties.").

But the presumption of regularity is hardly unrebuttable, monolithic, or categorical. State and federal courts have set aside that presumption in individual cases where prosecutors have fallen

short, and across the board in circumstances when the presumption is unwarranted. For instance: many state courts reverse the normal presumption of regularity and apply a presumption of vindictive prosecution when prosecutors reindict on a harsher charge or a defendant receives a harsher sentence following a successful appeal. *See, e.g.*, *State v. Figueroa*, No. A-2431-07T4, 2010 WL 3516836, at *4 (N.J. Super. Ct. App. Div. Aug. 31, 2010); *State v. Adams*, 293 Md. 665, 671 (1982) (finding a "presumption of vindictiveness" in the United States Supreme Court's *Goodwin* holding, which forbids a harsher sentence after appeal); *State v. Tsosie*, 171 Ariz. 683, 688 (Ct. App. 1992). Empirically, when a prosecutor raises the stakes after losing, the odds of vindictiveness are simply too great for courts to default to a presumption of regularity. That presumption, then, is applied only when objectively earned and sustained through ethical and careful government practices. It is context-sensitive, empirically testable, and permeable by reality, not inherent in the prerogatives of the sovereign.

On any account, the government's behavior here has fallen short of the proper order that justifies the presumption of regularity. AG James' brief documents six years of personal attacks and explicit calls for vengeance from the President and his political allies, MTD at 2-9; the President's weaponization of government task forces and investigative resources to manufacture grounds to prosecute AG James and other political enemies, *id*. at 9; abuse of prosecutorial resources to interfere with an unrelated investigation launched by AG James into one of the President's allies, *id*. at 20-21; the President's dismissal of career prosecutors and his own handpicked acting U.S. Attorney when they followed their ethical responsibilities and refused to seek a retaliatory indictment against AG James, *id*. at 17-18; and even explicitly retributive football-spiking after the President's purpose-appointed personal lawyer eked out the indictment., *id*. at 19. All this comes against a broader backdrop of this Administration's unprecedented

18

departures from long-standing prosecutorial norms. AG James is hardly the only victim of this Administration's campaign of vindictive prosecutions and investigations of actual and perceived political adversaries: others include former FBI Director James Comey, Senator Adam Schiff, former CIA Director John Brennan, and the President's own former National Security Advisor, John Bolton.[18]

Prosecutorial decisions deserve deference when they conform to high ethical standards and widely-accepted norms of practice. But when they diverge radically, as the government's did here, they forfeit the presumption of regularity. *See Dombrowski v. Pfister*, 380 U.S. 479, 490 (1965) (carving out an exception to a normal deference doctrine where government no longer deserves the presumption of good faith); *Schad v. Arizona*, 501 U.S. 624, 640-42 (1991) ("freakish" government behavior "that finds no analogue in history or in the criminal law of other jurisdictions" would "deviate[] so far from the constitutional norm as to violate the Due Process Clause."). This Court should not defer to a vexatious prosecution. It should instead dismiss the indictment against AG James.

## CONCLUSION

The Court should grant Attorney General James' requested relief and dismiss the indictment with prejudice.

Respectfully Submitted,

*/s/ Kevin Byrnes*

KEVIN BYRNES (VA Bar No. 47623)

---

[18] *See United States v. Comey*, No. 25-CR-272 (E.D. Va.); Katelyn Polantz & Donald Judd, *Prosecutors are hesitant to charge Trump foe Adam Schiff, sources say*, CNN (Oct. 23, 2025, 6:27 PM), https://perma.cc/PXM5-DW9D; Glenn Thrush et al., *Trump Loyalists Push 'Grand Conspiracy' as New Subpoenas Land*, N.Y. TIMES (Nov. 9, 2025), https://perma.cc/8E7V-2PMS; Josh Gerstein, *How John Bolton's criminal case stacks up to other high-profile classified docs probes*, POLITICO (Oct. 22, 2025, 5:55 AM), https://perma.cc/7WUR-NZKK.

FLUET
1751 Pinnacle Drive, Suite 1000,
Tysons, VA 22102
(703) 590-1234
Kbyrnes@fluet.law

JOSHUA PERRY*
VICTORIA RECALDE FELDMAN*
BRITTANY HANKE*
PERRY LAW, LLC
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

NORMAN L. EISEN*
STEPHEN A. JONAS*
JOSHUA G. KOLB*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
(202) 594-9958
Norman@democracydefenders.org
Steve@democracydefenders.org
Joshua@democracydefenders.org

WENDY R. WEISER*
MIRIAM ROSENBAUM*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
Weiserw@brennan.law.nyu.edu
Rosenbaumm@brennan.law.nyu.edu

*Counsel for Amici*

*\* Pro hac vice motion pending*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, the foregoing document was filed with the

Clerk of the Court, and all other parties will be served through counsel.

*/s/ Kevin Byrnes*

KEVIN BYRNES (VA Bar No. 47623)
FLUET
1751 Pinnacle Drive, Suite 1000,
Tysons, VA 22102
(703) 590-1234
Kbyrnes@fluet.law